# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

––––––––––––––––

### No. ACM 40019

––––––––––––––––

### UNITED STATES
*Appellee*

**v.**

### Chase M. THOMPSON
Airman First Class (E-3), U.S. Air Force, *Appellant*

––––––––––––––––

Appeal from the United States Air Force Trial Judiciary

Decided 29 November 2021

––––––––––––––––

*Military Judge:* Willie J. Babor.

*Sentence:* Sentence adjudged 30 September 2020 by GCM convened at Ramstein Air Base, Germany. Sentence entered by military judge on 13 November 2020: Dishonorable discharge, confinement for 12 months, and reduction to E-1.[1]

*For Appellant:* Major Alexander A. Navarro, USAF; Captain Alexandra K. Fleszar, USAF; R. Davis Younts, Esquire.

*For Appellee:* Colonel Naomi P. Dennis, USAF; Lieutenant Colonel Matthew J. Neil, USAF; Captain Cortland T. Bobczynski, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, KEY, and MEGINLEY, *Appellate Military Judges*.

Judge MEGINLEY delivered the opinion of the court, in which Chief Judge JOHNSON and Senior Judge KEY joined.

––––––––––––––––

––––––––––––––––

[1] Appellant was assigned to Aviano Air Base, Italy, at the time of the allegations. However, due to travel restrictions into Italy as a result of the COVID-19 pandemic, Appellant's court-martial was moved from Aviano Air Base to Ramstein Air Base, Germany.

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————————

MEGINLEY, Judge:

Contrary to his pleas, a general court-martial composed of a military judge sitting alone convicted Appellant of one specification of sexual assault of VP, a child who had attained the age of 12 but not attained the age of 16 years, on divers occasions, by penetrating her vulva with his penis, in violation of Article 120b, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920b; one specification of producing child pornography, in violation of Article 134, UCMJ, 10 U.S.C. § 934; and one specification of making a false official statement, in violation of Article 107, UCMJ, 10 U.S.C. § 907.[2] Appellant was sentenced to a dishonorable discharge, confinement for 12 months, and reduction to the grade of E-1. The convening authority approved the sentence in its entirety.

Appellant raises three assignments of error on appeal: (1) whether the evidence was legally and factually sufficient to support his convictions for sexual assault of a child and production of child pornography; (2) whether his sentence to 12 months of confinement was inappropriately severe; and (3) whether Appellant's requirement to register as a sex offender represents cruel and unusual punishment, or otherwise warrants sentence appropriateness relief. We have carefully considered issue (3) and determined it warrants no discussion or relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).

Although we find Appellant's conviction for sexual assault of a child legally and factually sufficient, we find his conviction for the production of child pornography to be factually insufficient. Accordingly, we set aside the findings of guilt to the Specification of Charge IV and Charge IV with prejudice.

———————————

[2] The false official statement charge and its specification occurred prior to 1 January 2019; therefore, this charge falls under the *Manual for Courts-Martial, United States* (2016 ed.) (2016 *MCM*). The alleged offenses of sexual assault of a child and production of child pornography occurred after 1 January 2019; therefore, these charges and specifications fall under the *Manual for Courts-Martial, United States* (2019 ed.) (2019 *MCM*). All charges and specifications were referred to trial after 1 January 2019; accordingly, all other references to the UCMJ and Rules for Courts-Martial (R.C.M.) are to the 2019 *MCM*. *See* Exec. Order 13,825, §§ 3, 5, 83 Fed. Reg. 9889, 9889–90 (8 Mar. 2018). Appellant was also charged with five specifications of abusive sexual contact, in violation of Article 120, UCMJ, 10 U.S.C. § 920, related to another complainant, who was an active duty member of the Air Force; Appellant was acquitted of the charge and all five specifications. The false official statement charge stems from the investigation into the abusive sexual contact allegations.

Finding no other prejudicial error, we affirm the remaining findings and reassess the sentence to a dishonorable discharge, confinement for 12 months, and reduction to the grade of E-1.

## I. BACKGROUND

Appellant entered active duty in July 2017 and was stationed at Aviano Air Base, Italy. At the time of the allegations, Appellant was 20 years old.

### A. Appellant's Communications with VP

On or about 27 March 2019, Appellant met VP on the Bumble cell phone dating application. On Bumble, the female must reach out to the male to begin a conversation. In this case, VP reached out to Appellant. At the time, the first picture of VP in her Bumble profile featured a text overlay with VP's first name followed by a number, indicating her age.[3] Further down in VP's profile was a text area stating: "Funny guys and a good taste in music. Looking for something casual, maybe I can even make you smile.//18// instagram: [VP's username]." The profile also indicated that VP was in college.[4] In actuality, VP was 15 years old and lived with her mother and stepfather, the latter of whom was an active-duty servicemember.

Appellant and VP quickly moved their communication from Bumble to WhatsApp, another social media application. Over the course of the next two months, from 29 March 2019 to 30 May 2019, Appellant and VP exchanged 918 messages using the WhatsApp application. The content of these 918 messages formed a significant part of the Government's case against Appellant, and indicates that on 30 March 2019, 5 April 2019, 11 April 2019, and 15 April 2019, Appellant went to VP's residence and engaged in sexual activity with her. The messages also revealed that VP stated she was drinking alcohol while messaging Appellant, talked about relationships with other, older men, and mentioned that she consumed "edibles" (presumably drugs). The WhatsApp messages indicate that VP went to Germany and London for unknown periods of

[3] According to witness testimony, this age is computed automatically by the Bumble system. The Defense submitted two copies of this image, one showing VP's age reflected as 19 and one showing 20. The first one captured VP's profile as it appeared around the time of Appellant's offenses, while the second was captured during an analysis by a defense expert a few days prior to Appellant's court-martial.

[4] VP informed investigators that she listed her age as 16 in her Instagram profile; however, as discussed *infra*, investigators never actually looked at VP's Instagram account to verify this information, and the Government offered no evidence either confirming this claim or establishing that Appellant ever viewed VP's Instagram profile.

time from 15 April 2019 to 29 May 2019. Although Appellant and VP continued to communicate on WhatsApp from 15 April 2019 through 29 May 2019, there is no indication that they engaged in sexual activity during this timeframe. Additionally, there is no indication in the messages that Appellant knew VP was 15 years old.

## B. Video Evidence of Appellant and VP

As part of the evidence against Appellant, the Government also introduced two videos. One of the videos was of Appellant and VP lying on her bed talking and kissing, with Appellant naked and VP in her underwear. The other video was of Appellant and VP engaging in sexual intercourse.[5] On 30 April 2019, VP sent Appellant a message asking him, "[Where's] the dirty video b*tch?," in reference to the video Appellant took of himself and VP having sexual intercourse. Appellant then sent her the video through Snapchat, a social media application.

As their brief relationship progressed, and in some regards struggled, on 15 May 2019 VP told Appellant she was dating someone new, and that he should do the same. Appellant responded by asking, "Who are you dating?" and "Is he atleast [sic] your own age[?]" Nonetheless, Appellant and VP continued to talk and appeared to mend the issues they were having with each other. They eventually made plans for Appellant to go to VP's residence on 30 May 2019.

On 29 May 2019, VP was at her residence spending time with a friend, AV, who had recently flown back to Italy for the summer.[6] While they were spending time with each other, VP showed AV a video on her cell phone of VP having sexual intercourse with a male. The next day, AV disclosed to her mother that VP showed her the video.[7] On 30 May 2019, agents from the Air Force Office of Special Investigations (AFOSI) received the information from AV about VP having sex with an Airman. Based on the information AV provided, agents were able to identify Appellant as the subject. Agents then went to VP's residence to conduct surveillance of the residence to see if Appellant would be

---

[5] In both videos, the same movie is heard in the background. Thus, the court can reasonably surmise these videos were taken within a very short time of each other on the same day.

[6] AV had lived in Italy with her active duty mother when she met VP, but eventually moved to Utah to be with her active duty father.

[7] AV indicated elsewhere in the record that she was supposed to spend time with VP the next day, but she decided not to, as VP told AV that Appellant would be coming over to her house to have sex with her.

there. Appellant arrived, but parked down the street from VP's residence. According to WhatsApp messages, Appellant arrived at VP's residence at 0735 and left later that morning. Agents parked near the residence and photographed Appellant leaving the residence.

## C. Retrieval and Forensic Extraction of VP's Cell Phone and other Evidence

On the same day, 30 May 2019, AFOSI contacted VP's stepfather, Master Sergeant (MSgt) RH, to inform him that VP had been having sexual intercourse with adult men. Agents asked MSgt RH if he would retrieve VP's cell phone. MSgt RH agreed, but before he went to his residence, he picked up his wife, who was also working that day. Once at the residence, MSgt RH and VP's mother confronted VP. According to MSgt RH:

> We got to the house. My wife and I walked in there and my wife talk [sic] to her and said, hey, you know, [VP], we need your cell phone. Instantly, when she said that[,] [VP] was, you know, suspicious on why we needed the cell phone. We said we need your cell phone, and [VP] didn't want to give the phone up, she said.

He further testified:

> [VP] started crying. She got angry. And she went to log into the phone. She said, I'll give it to you, but I have to do something. She went to get into the phone. My wife went to grab it and [VP] threw it on the ground and smashed her phone.

MSgt RH explained that he had been instructed from AFOSI: "[O]nce we talked to [VP], to not let her get into the cell phone. That is what he told us. We need it as is." After he retrieved the phone, MSgt RH turned it over to AFOSI. MSgt RH also testified that VP was 15 years old during the charged timeframe. MSgt RH confirmed that various pictures admitted into evidence were of his stepdaughter, his residence, and VP's bedroom. MSgt RH also testified that VP was homeschooled at the family's residence, and that she stayed home by herself with no supervision during the day while completing online classwork. AFOSI agents later went to MSgt RH's residence, where they seized a pair of VP's underwear. DNA analysis determined that Appellant's semen was present on the underwear.

JAM, a forensic examiner from the Computer Forensics Laboratory of the Defense Cyber Crimes Center (DC3), testified that DC3 conducted an extraction of VP's phone. JAM testified that DC3 was able to retrieve multiple photographs of Appellant, dated 11 April 2019, and one photograph of Appellant, dated 30 April 2019. JAM also testified that DC3 found the two aforementioned videos of VP and Appellant. JAM stated the videos were made on an Apple iPhone.

5

Regarding the video of Appellant and VP laying on her bed, JAM testified that when Appellant transmitted the video via WhatsApp, the original date and timestamp were stripped and a new date, 30 April 2019, was created. Due to this transfer, JAM stated, "[Y]ou can't specifically say you know when it was recorded. Just when it was transferred via that app."

As for the video of Appellant having sex with VP, JAM testified that the video was "native to Apple's filing scheme." However, JAM stated:

> [R]eviewing the database, photos -- database, you can see that the video was saved in a Snapchat album, so within the camera, the Apple camera, you also have albums. When you save a video out of Snapchat, Apple automatically places it in a Snapchat album and that video is seen in the Snapchat album. So the video, the timestamp of that video is the date that it came through that application, not specifically when it was recorded.

JAM also stated that the extraction showed Snapchat messaging between VP and Appellant; however, he noted:

> That database only retains data for 30 days, so it doesn't go back far enough to April 30, because the phone was received on May 30. But I can see between May 3 and May 15 there was messaging from [Appellant's Snapchat account], but I can't see the specific words or pictures.

Regarding the videos, JAM concluded: "[T]he first video came through WhatsApp -- after they discuss the video, [VP] asks, where's the dirty video. And then about two hours later the dirty video appears on the device or a sex video appears on the device." JAM also testified that in reviewing the search history of VP's phone, he found three instances where VP lied about her age to adult men, telling them that she was 18 years old. However, on one occasion, VP told a user on WhatsApp that she was 16 years old.

## D. VP's Representation of her Age

Special Agent MC interviewed VP at the outset of AFOSI's investigation. Agent MC testified he was "fairly certain" VP told him she met Appellant through Instagram and told Appellant she was 16 years old. When pressed by Appellant's civilian defense counsel to clarify whether they met on Instagram or Bumble, Agent MC recalled "that she was 18 on her other social media applications [including, he believed, Bumble], however, she mentioned she was 16 on Instagram." Agent MC was the initial case agent but turned the case over to other agents when he left on a deployment. However, Agent MC did not follow up on information provided by AV that VP was on Bumble and met Appellant on Bumble, nor could he speak to the actions of the other agents. Fur-

thermore, Agent MC did not look at VP's Instagram account the day he interviewed her or at any point afterward, despite the fact that VP agreed to provide her Instagram log-in information to Agent MC. When asked whether AFOSI verified what VP told them about her Instagram account, Agent MC stated, "I only know the activities I was involved in, sir. As far as anything else that was conducted, the review of her social media accounts, I had no involvement with that."

At trial, the Government called Senior Airman (SrA) DN to testify about a conversation he had with VP. SrA DN met VP on Bumble and stated that VP listed her age as 18.[8] VP also identified herself as a criminal justice major and a ballerina from Germany. SrA DN and VP quickly switched communications to Instagram, where VP told SrA DN she was 16. SrA DN eventually found out that VP was younger than 16 and had lied about being in college. SrA DN later confronted VP through Instagram, stating that she could get a lot of people in trouble, to which VP responded that SrA DN "wouldn't have been the first guy in the Air Force." VP also expressed that she had done things like this in the past, that it was not illegal in Europe, and that she did not believe it was a big deal. SrA DN never met VP in person.

**E. Statements by Appellant**

The Government also called two witnesses to testify about comments Appellant made after the investigation began. The Government called Technical Sergeant (TSgt) LC, who overheard Appellant ask an Italian national what the age of consent was in Italy. When the Italian national answered that it was 14 years of age, Appellant responded that he would be "scot-free" because of what the age was, or words to that effect. TSgt LC did not provide an exact date for this conversation, but stated it happened in the summer of 2019 at a going-away gathering.

The Government also called Airman First Class (A1C) TM. A1C TM testified that he and Appellant were hanging out together on 23 June 2020. Appellant had been drinking alcohol and "kept talking about an underaged woman and then he told [A1C TM] different variations of a story of it." A1C TM testified that Appellant said he "had met a girl that was -- he was continuing to have intercourse and then he found out eventually that she was underaged and continued." A1C TM later added: "He told me three different stories[:] that it was a master sergeant's daughter, a German girl or woman and an Italian girl." Appellant did not mention who he was referring to, the age of the girl, or what he meant by "underage." A1C TM stated, "I just continued to ignore him

---

[8] SrA DN did not specifically recall the exact date when he first communicated with VP, but remembered it was "April-ish," or approximately April 2019.

because I thought he was too drunk or something like that, but he passed out in my passenger seat on the way home."

When Appellant was brought in for questioning on 30 May 2019, he did not provide a statement to AFOSI.

## F. Appellant's Case-in-Chief

The Defense called one witness in its case in chief—JLM, a private computer forensic examiner. During his examination of VP's cell phone, JLM found VP claimed to be 18 years old to individuals in their 50's, 40's, 30's, and 20's. JLM also found a profile in another dating application, Badoo, where VP portrayed herself as being 18. He also found VP was active on Tinder and on a website called "Seeking Arrangement."[9]

In the 918 WhatsApp messages admitted into evidence, VP never disclosed she was 15 to Appellant, and with the exception of one message, age was never discussed. VP did not testify at Appellant's trial; neither did Appellant.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

#### 1. Law

We review issues of legal and factual sufficiency de novo. Article 66(d), UCMJ, 10 U.S.C. § 866(d); *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v.*

---

[9] JLM testified:

> When you go to the website for Seeking Arrangement, the site itself is designated towards individuals seeking dating or hook-up type of activities. And even in their own language they specifically state the term, sugar baby, sugar momma, and sugar daddy, so I think the intention of this site, as I've seen before through case work, is that older individuals and younger individual[s] will collaborate to some kind of an arrangement that benefits both parties.

*Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "the standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alterations, internal quotation marks, and citation omitted), *cert. denied*, ___ U.S. ___, 139 S. Ct. 1641 (2019).

"[T]he government is free to meet its burden of proof with circumstantial evidence." *Id.* (citations omitted). This includes using circumstantial evidence to prove an accused's knowledge. *See United States v. Curtin*, 9 U.S.C.M.A. 427, 432 (C.M.A. 1958).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399).

Appellant was convicted of sexual assault of a child, in violation of Article 120b, UCMJ. The Government was required to prove two elements beyond a reasonable doubt: (1) that on divers occasions, Appellant committed a sexual act upon VP; and, (2) that at the time of the sexual act, VP had attained the age of 12 years but not attained the age of 16 years. *See Manual for Courts-Martial, United States* (2019 ed.) (2019 *MCM*), pt. IV, ¶ 62.b.(2)(a).

In a prosecution under Article 120b, UCMJ, the Government does not need to prove that an accused knew a child had not attained the age of 16. However, it is a defense in a prosecution under subsection (b) (sexual assault of a child), that he reasonably believed that VP had attained the age of 16 years, which Appellant must prove by a preponderance of the evidence. *See* 2019 *MCM*, pt. IV, ¶ 62.a.(d)(2); *see also* R.C.M. 916(j)(2).

R.C.M 916(j)(1) states:

> [I]t is a defense to an offense that the accused held, as a result of ignorance or mistake, an incorrect belief of the true circumstances such that, if the circumstances were as the accused believed them, the accused would not be guilty of the offense. If the

ignorance or mistake goes to an element requiring premedita-tion, specific intent, willfulness, or knowledge of a particular fact, the ignorance or mistake need only have existed in the mind of the accused. *If the ignorance or mistake goes to any other ele-ment requiring only general intent or knowledge, the ignorance or mistake must have existed in the mind of the accused and must have been reasonable under all the circumstances.*

(Emphasis added).[10]

An accused is not required to testify in order to establish a mistake-of-fact defense. *United States v. Jones*, 49 M.J. 85, 91 (C.A.A.F. 1998). The evidence to support a mistake-of-fact instruction can come from evidence presented by the defense, the prosecution, or the court-martial. *Id*. (citations omitted).

Appellant was also convicted of producing child pornography, in violation of Article 134, UCMJ. The Government was required to prove two elements beyond a reasonable doubt: (1) that Appellant knowingly and wrongfully pro-duced child pornography; and, as charged, (2) under the circumstances, the conduct of the accused was of a nature to bring discredit upon the armed forces. *See* 2019 *MCM*, pt. IV, ¶ 95.b.(4).

"'Child pornography' means material that contains either an obscene visual depiction of a minor engaging in sexually explicit conduct or a visual depiction of an actual minor engaging in sexually explicit conduct." 2019 *MCM*, pt. IV, ¶ 95.c.(4). A "'[m]inor' means any person under the age of 18 years." 2019 *MCM*, pt. IV, ¶ 95.c.(7). "'Producing' means creating or manufacturing. . . . [I]t refers to making child pornography that did not previously exist. It does not include reproducing or copying." 2019 *MCM*, pt. IV, ¶ 95.c.(9). "Sexually explicit con-duct" includes sexual intercourse. *See* 2019 *MCM*, pt. IV, ¶ 95.c.(10)(a).

"An accused may not be convicted of . . . producing child pornography if he was not aware that the images were of minors, or what appeared to be minors, engaged in sexually explicit conduct. Awareness may be inferred from circum-stantial evidence . . . ." 2019 *MCM*, pt. IV, ¶ 95.c.(5). Thus, the Government must prove an accused knew or believed the pornography depicted a minor.

**2. Analysis**

There was no dispute during trial, nor is there any on appeal, that VP was in fact 15 years old at the time of the alleged sexual acts with Appellant and

---

[10] *See United States v. James*, No. ACM 39458, 2019 CCA LEXIS 438, at *15 (A.F. Ct. Crim. App. 31 Oct. 2019) (unpub. op.) (explaining that a general intent offense such as sexual assault of a child "has an implied mens rea that the accused intentionally com-mitted the sexual act").

alleged production of child pornography. Moreover, Appellant did not contest at trial, nor does he on appeal, the evidence establishing that the sexual acts in fact occurred. For the production of child pornography, the charging scheme placed the burden on the Government to prove Appellant knew VP was under the age of 18 years when he "produced" the child pornography. However, in order for Appellant to defend the sexual assault of a child charge, and show mistake of fact as to VP's age, the charging placed a burden on Appellant to prove by a preponderance of the evidence that he had an honest and reasonable belief she was at least 16 years of age.

### a. Production of Child Pornography

The Government did not charge Appellant with possession or distribution of child pornography related to the video he sent VP on 30 April 2019. Also, there was no evidence from the Government that, at the time of when Appellant's phone was seized, his phone still contained the sex video. Instead, the Government charged production of child pornography, under Article 134, UCMJ, which required proof that Appellant *knew* he produced *child* pornography.

The WhatsApp messages introduced at trial strongly suggest that Appellant filmed himself having sex with VP between 30 March 2019 and 15 April 2019, but not later than 30 April 2019. Appellant was charged with producing child pornography, but the Government did not prove when the video was produced, nor was there evidence in the WhatsApp or Bumble messages, or testimony, that Appellant *knew* VP was under 18 *at the time he made the sex video with her*. The video of Appellant having sex with VP renders no disposition as to VP's age, nor does the other video with Appellant lying naked in VP's bed. Thus, the primary evidence used to convict Appellant must have been testimony regarding VP's age (from her stepfather) and the WhatsApp messages between Appellant and VP—the latter of which provide significant circumstantial evidence about the relationship between VP and Appellant but never indicate VP's actual age.

The Government highlights the fact that VP's Bumble account was linked to her Instagram account, which Agent MC testified that VP claimed during the investigation listed her age as 16, to circumstantially prove Appellant knew VP was not 18. However, there was no evidence adduced at trial that these accounts were actually "linked"—instead, the images of VP's Bumble account simply show her Instagram username. Moreover, there was no indication in the WhatsApp messages that Appellant was aware of this link before 15 April 2019, much less that Appellant ever looked at the section of VP's Instagram account which purportedly listed her age as 16. Indeed, in those WhatsApp messages, the only time Instagram is mentioned at all is on 28 May 2019. Notably, AFOSI agents did not look at VP's Instagram account to verify

any of the information she provided, *despite her willingness on 30 May 2019 to provide her Instagram log-in information.* Thus, the information Agent MC says VP told him was contained in her Instagram account has minimal evidentiary import to this case.

The Government directs us back to A1C TM's testimony, in which Appellant told A1C TM that Appellant "had met a girl that was -- he was continuing to have intercourse and then he found out eventually that she was underaged and continued." However, A1C TM was unable to confirm the identity of the girl, how old she was actually was, or when Appellant found out that she was underage.[11] The Government also argues that Appellant knew VP was not at least 18 years of age because he hid his relationship with others and sneaked in and out of VP's house while her parents were at work; we do not find this argument persuasive. Even if VP was 18 years old, it is plausible Appellant would have believed her parents would disapprove of her having sex with her boyfriend in their house, much less while she was supposed to be in school. Moreover, for purposes of the child pornography specification, evidence that Appellant suspected or should have suspected VP might be under 18 years old is insufficient to meet the Government's burden of proof.

Based on VP's statements to AFOSI agents that she told Appellant she was 16 years old, it is quite probable that Appellant did in fact become aware *at some point* in their brief relationship that VP was under the age of 18. Nonetheless, the Government still had the burden to prove Appellant *knew* VP was under 18 during the very short window in which the video could have been made. After weighing all the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are not convinced of Appellant's guilt beyond a reasonable doubt. Therefore we find Appellant's conviction for production of child pornography factually insufficient.

### b. Sexual Assault of a Child

Nonetheless, the Government could prove that VP was in fact 15 years old when Appellant had sex with her. While there was no direct evidence that Appellant knew VP was 15 years old, if Appellant wanted to defend against this element, he had to prove by a preponderance of the evidence that his ignorance or mistake of VP's age *existed in his mind and was reasonable under all the circumstances.*

---

[11] Despite the Government's assertion that Appellant used the term "underaged" to mean under 16 years old, the court cannot surmise what "underaged" meant in this context.

Other than interviewing with AFOSI when this case came to light, VP did very little to cooperate with authorities and did not participate at trial. Further, other than AFOSI surveillance photos showing Appellant leaving VP's residence, and VP showing AV the sex video, there were no eyewitness or testimonial accounts about Appellant and VP's relationship during the charged timeframe. Finally, Appellant did not provide a statement to AFOSI relating to VP, and at his trial, he exercised his right not to testify.

The record shows that VP consistently held herself out to be at least 16 years old to individuals she was meeting on various social media platforms and cell phone dating applications. While there is no discussion of VP's actual age in the WhatsApp messages Appellant and VP exchanged between 28 March 2019 and 30 May 2019, there are numerous examples in the record which would support the reasonableness of a belief that VP was over the age of 16: the references on VP's Bumble account to being 18 years old and being an "undergrad;" VP stating she was drinking alcohol while messaging Appellant; VP talking about relationships with other, older men; VP's mention of consuming "edibles" (presumably drugs); VP purportedly taking a college class; and VP leaving Italy to go to London and Germany for weeks at a time when someone under 18 years old would presumably have been in school.

Under all of the circumstances, although there was plenty of evidence for one to conclude that Appellant *could have had* a reasonable belief VP was at least 16, there was no direct evidence that this belief existed in Appellant's mind. Even Appellant acknowledges this on appeal, noting that "there is no direct evidence that shows [he] ever knew her real age during the time period between 30 March 2019 and 30 May 2019. Rather, there is only evidence about [his] conduct." We agree with this assessment, and as such, the Defense failed to meet its burden to demonstrate by a preponderance of the evidence that a mistake of fact actually existed in Appellant's mind every time he had sex with VP. We conclude that a rational factfinder could have found beyond a reasonable doubt all the essential elements of sexual assault upon a child. Furthermore, in assessing factual sufficiency, after weighing all the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt. Therefore, we find Appellant's conviction for sexual assault of a child both legally and factually sufficient.

## B. Reassessment by the Court and Sentence Appropriateness

Having dismissed the Specification of Charge IV and Charge IV, we consider whether we should reassess the sentence or return this case for a sentence rehearing. We are confident we can accurately reassess an appropriate sentence.

This court has "broad discretion" in deciding to reassess a sentence to cure error and in arriving at an appropriate reassessed sentence. *United States v. Winckelmann*, 73 M.J. 11, 15 (C.A.A.F. 2013). The United States Court of Appeals for the Armed Forces (CAAF) has observed that Courts of Criminal Appeals judges can modify sentences "'more expeditiously, more intelligently, and more fairly' than a new court-martial . . . ." *Id.* at 15 (quoting *Jackson v. Taylor*, 353 U.S. 569, 580 (1957)).

The CAAF has provided an illustrative list of factors for Courts of Criminal Appeals to consider in determining whether to reassess a sentence or order a rehearing:

> (1) Dramatic changes in the penalty landscape and exposure.
>
> (2) Whether an appellant chose sentencing by members or a military judge alone. As a matter of logic, judges of the courts of criminal appeals are more likely to be certain of what a military judge would have done as opposed to members. This factor could become more relevant where charges address service custom, service discrediting conduct or conduct unbecoming.
>
> (3) Whether the nature of the remaining offenses capture the gravamen of criminal conduct included within the original offenses and, in related manner, whether significant or aggravating circumstances addressed at the court-martial remain admissible and relevant to the remaining offenses.
>
> (4) Whether the remaining offenses are of the type that judges of the [C]ourts of [C]riminal [A]ppeals should have the experience and familiarity with to reliably determine what sentence would have been imposed at trial.

*Id.* at 15–16 (citations omitted).

We have evaluated all four factors. Furthermore, we have given particular attention to a comment the military judge made after he announced sentence:

> For those who may review this record, although not pertinent, under the applicable rules if sentencing under the new rules, I would have sentenced this accused to reduction to E-1; no confinement for the specification of Charge II, 12 months of confinement for the specification of Charge III; and 12 month of confinement for the Specification of Charge IV, with the sentences of confinement running concurrently. And to be frank, I would have sentenced [Appellant] to no punishment for the specification of Charge II.

Therefore, considering the facts of Appellant's case and the totality of the circumstances, we find we are able to determine that, "absent any error, the sentence adjudged would have been of at least a certain severity . . . ." *United States v. Sales*, 22 M.J. 305, 308 (C.M.A. 1986). Having so found, and having considered Appellant, the nature and seriousness of his offenses, and all matters contained in the record of trial, to include all matters Appellant submitted in his case in extenuation, and mitigation, we reassess Appellant's sentence to a dishonorable discharge, confinement for 12 months, and reduction to the grade of E-1, as an appropriate sentence for his crimes.

## III. CONCLUSION

The findings of guilty to the Specification of Charge IV and Charge IV are **SET ASIDE** and **DISMISSED WITH PREJUDICE**. The remaining findings and the sentence as reassessed are correct in law and fact, and no other error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the remaining findings and the reassessed sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court